JM:MLY
F.#2009R00715

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -

ALAN LABINER,
     also known as
     "Alan Labineri" and
     "David Alan Labiner,"
KHURRAM TANWIR,
     also known as
     "Raja Arshad,"
     "Cory Taylor,"
     "Corey," and
     "Cori" and
AHMED AWAN,

             Defendants.

- - - - - - - - - - - - - - X

M-09-823

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF ARREST WARRANT

MISC. No. _____
(15 U.S.C. §§ 78j(b) and 78ff;
17 C.F.R. § 240.10b-5; and
18 U.S.C. §§ 1341, 1343
and 3551 et seq.)

     DANE B. WESLEY, being duly sworn, deposes and says that he
is a Postal Inspector with the United States Postal Inspection
Service ("Inspection Service"), duly appointed according to law
and acting as such.

          In or about and between March 2004 and September 2009,
both dates being approximate and inclusive, within the Eastern
District of New York and elsewhere, the defendants ALAN LABINER,
also known as "Alan Labineri" and "David Alan Labiner," KHURRAM
TANWIR, also known as "Raja Arshad," "Cory Taylor," "Corey," or
"Cori," and AHMED AWAN and others did knowingly and intentionally
conspire to execute a scheme and artifice to commit securities

fraud, mail fraud, and wire fraud contrary to Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17 Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 1341; and Title 18, United States Code, Section 1343, respectively, all in violation of Title 18, United States Code, Section 371.

The source of my information and the grounds for my belief are as follows:[1]

1. I have been employed as a Postal Inspector for the Inspection Service since 1993, and am currently assigned to the Hicksville, New York Multi-functional team. I am one of the case agents with primary responsibility for this investigation. While working for the Inspection Service, I have participated in numerous investigations of criminal activity, including the investigation of securities fraud, "boiler room" operations engaged in telemarketing fraud, money laundering schemes, and other types of wire fraud and bank fraud schemes. During the course of these investigations, I have conducted or participated in surveillance, undercover transactions, the execution of search warrants, debriefings of informants, and reviews of taped conversations and financial records.

---

[1] Because the purpose of this affidavit is only to establish probable cause to search, I have not included each and every fact known to me concerning this investigation.

2.   I am familiar with the information contained in this affidavit based on my personal participation in the investigation, my review of documents, my training and experience, and my discussions with other law enforcement personnel concerning the investigation.  Additionally, statements herein attributable to individuals are set forth in sum and substance and in part.

## BACKGROUND OF INVESTIGATION

3.   This case concerns a series of fraudulent securities offerings and promissory note schemes orchestrated by conspirators ALAN LABINER, KHURRAM TANWIR, AHMED AWAN, and others.  The first scheme concerned a purported real estate investment trust, or "REIT," named Manhattan North Real Estate Investment Trust, Inc. ("Manhattan North") that claimed to invest in real property in upper Manhattan; the second scheme concerned a company named Next Point USA, Inc. ("Next Point") that purportedly invested in credit cards with high interest rates; the third scheme concerned a company that sold boxing equipment and clothes, Grant Boxing, Inc.; and the fourth scheme concerned Exposure Management Group ("Exposure Management"), a company that claimed to manage and promote popular musicians, models, and actors.  On occasion, conspirators LABINER, TANWIR, and AWAN marketed the schemes under the names of the individual companies, but the conspirators also marketed the schemes under the names

Locke, Landis & Harriman, Inc. ("Locke Landis") or, later, Landis, Harriman & White, Inc. ("Landis Harriman"), which are referred to collectively herein as the "ORGANIZATION." In each scheme the defendants first tricked investors into sending them money by lying about the companies or the securities, then commingled and misappropriated the investors' money. From approximately March 2004 through June 2009, the defendants have taken more than $6,000,000 from at least 50 investors, including Individual Retirement Account ("IRA") funds from senior citizens, and have spent the money for their own personal benefit. Analysis of the ORGANIZATION's bank accounts indicates that the defendants have spent the investors' money on strip clubs, clothing, restaurant meals, luxury hotels, liquor, gasoline, pharmacy expenses, taxis, car washes, movies, music store purchases, and tanning salons.

4.    The members of the ORGANIZATION have managed to conceal their identities from investors through a variety of means.  They used fake names; they had mail sent to commercial mail receiving agencies (sometimes called "mail drops") instead of the actual location of their boiler room; and they limited most of their contact with investors to phone conversations. Moreover, when investors called the ORGANIZATION, they did not reach the ORGANIZATION through the actual numbers they dialed, but instead had their calls forwarded to numbers they never knew.

For example, some numbers that investors dialed were actually operated by an out-of-state answering service that screened the calls and forwarded them to the ORGANIZATION.[2]

     5.   The schemes at issue here are only the most recent for LABINER, TANWIR, and AWAN.  From the late 1990s until mid-2001, LABINER and TANWIR sold high-yield promissory notes and private placement shares in bogus companies.  In 2001, the Maryland State Securities Commissioner found that securities offerings directed by LABINER and TANWIR were fraudulent. LABINER, TANWIR, and AWAN then engaged in similar fraudulent offering schemes that were the subject of a Securities and Exchange Commission ("SEC") action initiated in February 2004. In March 2004, conspirators LABINER, TANWIR, and AWAN were preliminarily enjoined from violating the federal securities laws by order or the Honorable Thomas P. Griesa of the Southern District of New York.  On December 3, 2008, Judge Griesa permanently enjoined LABINER, TANWIR, "and each of their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of [the court's] Final Judgment by personal service or otherwise" from

---

[2]    The ORGANIZATION's use of answering services over the years is confirmed by bank account records, which show payments to an answering service in Florida, by the experience of an investor who was actually told that he was speaking to an answering service, and by a bill sent to one of the ORGANIZATION's mail drops in April 2009 by "Answer Connect," an answering service in Portland, Oregon.

violating Section 10(b) of the Securities Exchange Act of 1934

(15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder (17

C.F.R. § 240.10b-5); from violating Section 17(a) of the

Securities Act of 1933 (15 U.S.C. § 77q(a)) in the offer or sale

of any security; and from "participating in an offering of penny

stock, including in activities with a broker, dealer, or issuer

for purposes of issuing, trading or inducing or attempting to

induce the purchase or sale of any penny stock."[3]

6.    LABINER, AWAN, and TANWIR were all, at one point,

registered representatives licensed by the National Association

of Securities Dealers (now known as the Financial Industry

Regulatory Authority, or "FINRA").  All three have since lost

their licenses.

**I. Manhattan North R.E.I.T., Inc.**

7.    Manhattan North purported to invest in real estate

in upper Manhattan, including Harlem.  Under the name of the

Locke Landis entity, the ORGANIZATION solicited investors to

purchase high-yield promissory notes issued Manhattan North by

representing that the notes were risk-free, 100% guaranteed

investments.   (Law enforcement officers have since spoken to

some of these investors.)  The ORGANIZATION represented that

---

[3]    Judge Griesa defined a penny stock as "any equity security
that has a price of less than five dollars, except as
provided in Rule 3a51-1 under the Exchange Act [17 C.F.R.
§240.3a51-1]."

Manhattan North would invest any funds raised in real estate. Investors were asked to purchase high yield promissory notes with three- or five-year terms. Bank records for accounts controlled by Locke Landis indicate that although interest payments on the Manhattan North notes were made initially, the payments ceased long before the notes matured, and the principal was never returned to investors. Nor were the monies used by Manhattan North to buy or develop property in upper Manhattan. Instead, the bank records show, the conspirators withdrew and spent investors' monies for their own benefit.

8.    An investor ("Investor-1") states that in or about May 2004, he received a phone call from a man who identified himself as "David Phillips" of Locke Landis. "Phillips" solicited Investor-1 for a promissory note in Manhattan North that he said would earn a good interest rate. The man who called himself "Phillips" also stated that the proceeds of the Note were to be used for building low-income property in New York City. Investor-1 expressed interest, and later received a printed brochure touting Manhattan North. Among other things, the brochure stated, under the heading "Capital Gains," that "M.N.P. allows its clients to enjoy what could only be considered high yield stable income for extended periods of time." The brochure, which listed Manhattan North's business address as 511 Avenue of the Americas, New York, NY 10011, also

promoted Manhattan North on the basis of its "transparent business practices." Investigation has revealed that 511 Avenue of the Americas is actually a commercial mail receiving agency, or "mail drop," and specifically a store run by the "Mail Box, Etc." company.

9. Sometime after receiving the brochure, Investor-1 sent Manhattan North a check for $10,000. In or about July 2004, Investor-1 purchased an additional promissory note from Manhattan North in the amount of $15,000. Finally, in or about January 2008, Investor-1 purchased yet another promissory note from Manhattan North for $10,000, bringing his investment to a total of $35,000. In connection with the last investment, Investor-1 received a letter from "David Phillips" on Manhattan North letterhead using the address 511 Avenue of the Americas, Suite 312, New York, NY 10011.

10. Investor-1 stopped receiving checks on his promissory note on or about January 21, 2009.

II. Next Point USA, Inc.

11. Next Point is a company that purported to invest in credit cards with high interest rates. Under the name of the Locke Landis entity, the ORGANIZATION solicited investors to purchase high-yield promissory notes issued by Next Point by representing that the notes were risk-free, 100% guaranteed investments, and that Next Point would invest any funds it raised

in its credit card business.  (Law enforcement officers have since spoken to some of these investors.)  The ORGANIZATION asked investors to purchase high yield promissory notes with three- or five-year terms.  Bank records for accounts controlled by Locke Landis indicate that although interest payments on the Next Point notes were made initially, the payments ceased long before the notes matured, and the principal was never returned to investors. Nor were the monies used by Next Point to invest in credit cards. Instead, the bank records show, the conspirators withdrew and spent investors' monies for their own benefit.

12.  In 2007, an investor ("Investor-2") received a cold call from an individual who identified himself as "Robert Brewster" of Next Point and offered to sell Investor-2 promissory notes in Next Point.  "Brewster" stated that Next Point invested in high interest credit cards which charged as much as 30%. Investor-2 expressed interest and received printed materials by mail.  The printed materials included a promissory note that listed Next Point of "388 2nd Avenue, Suite 445, New York, NY 10010" as the "issuer" and Locke Landis of "111 East 14th Street, Suite 173, New York, NY 10003" as the "guarantor."  Investor-2 soon invested $5000 in a promissory note with "Brewster" by mailing a check in the name of Next Point to 388 2nd Avenue, N.Y., N.Y.  Later, near the end of 2007, Investor-2 purchased an additional promissory note in Next Point for $10,000.  The second

promissory note also listed Next Point as the "issuer" and Locke Landis as the "guarantor" and gave the same two addresses that were on the first note.  Investigation has revealed that 388 2nd Avenue and 111 East 14th Street are actually mail drops, and specifically UPS stores.

13.  Investor-2 made a trip to New York City in connection with his Next Point investment in early 2008.  Next Point paid for round-trip airline tickets, a hotel, and a Broadway show for Investor-2 and his wife, and a dinner for at least five individuals: "Brewster," a female associate of "Brewster" named "Alexis," another female introduced to Investor-2 as an intern, and Investor-2 and his wife.  Investor-2 was not taken to the Next Point office and was told that it was not open during the weekend.  At the dinner "Brewster" assured Investor-2 that Next Point was a real company and urged him to continue his investment.  Investor-2 has since identified a photograph of ALAN LABINER as "Brewster."

14.  After Investor-2 returned home from New York, he sent the ORGANIZATION an additional $7,500 in a check dated March 13, 2008, payable to the Locke Landis entity.

15.  Investor-2 stopped receiving checks for his investments in or about January 2009.

III.     Grant Boxing, Inc.

16.  Grant Boxing is a company that purportedly sells boxing equipment and clothing.  Under the name of the Locke Landis entity, the ORGANIZATION solicited investors for a private placement of Grant Boxing stock.  (Law enforcement officers have since spoken to some of these investors.)  The ORGANIZATION sent investors offering memorandums stating that only 15% of the money raised by Locke Landis would go toward its commission.  My analysis of Locke Landis's bank records, however, indicates that almost 100% of the funds raised for private placements of Grant Boxing stock have not gone to Grant Boxing.  Nor have the funds been returned to investors.  Instead, the bank records show that the conspirators withdrew and spent investors' monies for their own benefit.

17.  An investor ("Investor-3") states that in or about December 2004, he received a phone call from a man who identified himself as "David Lawson" of Locke Landis.  "Lawson" had called Investor-3 about a month before regarding a different company, and Investor-3 had not purchased the stock, but on the second call "Lawson" touted a different company, Grant Boxing. He said that the company would go public in one or two years and tried to sell Investor-3 $10,000 worth of shares.  Investor-3 expressed interest and later received an offering memorandum for Grant Boxing dated September 1, 2004.  The memorandum stated in

several places that broker dealers selling the stock would not receive more than a 15% commission.  Investor-3 bought 100 shares for a total of $200 on or about December 10, 2004, and on or about March 8, 2005 he bought an additional 400 shares at $2.25 per share for a total of $900.  But Investor-3 never received his physical share certificates, despite making numerous requests for the certificates to Locke Landis.  Approximately two years ago, Locke Landis stopped returning his phone calls, and the number that Investor-3 used to contact Locke Landis is no longer functional.

18.  Investor-1 also bought shares in Grant Boxing from the ORGANIZATION.  In approximately May 2004, when Investor-1 bought shares in Manhattan North from "Dave Phillips" of Manhattan North, "Phillips" urged Investor-1 to speak with "David Lawson" of Locke Landis.  Approximately six or seven months later, Investor-1 did speak with "Lawson," who was selling shares in Grant Boxing.  Investor-1 was told that the Grant Boxing stock would go up in value when it went public through an IPO.

19.  Investor-1 was sent a private placement memorandum for Grant Boxing dated September 1, 2004.  Investor-1 sent $2,075 towards the purchase of Grant Boxing stock (1250 shares at $1.66 per share).  In or about January 2005, Investor-1 purchased $5,000 worth of additional shares of Grant Boxing stock

at $2.00 per share.  Later, Investor-1 bought a $10,000 Grant

Boxing promissory note and received several months of interest

payments on it. "Lawson" eventually suggested that the $10,000

principal be applied to the purchase of Grant Boxing stock.

Investor-1 purchased $4,950 worth of additional Grant Boxing

stock (with warrants) in February 2005.  In or about May 2005,

Investor-1 sent Locke Landis another $10,000 for 10,000 Grant

Boxing shares and warrants.  In or about November 2005, Investor-

1 sent yet another $10,000 to Locke Landis for either another

note or for additional Grant Boxing shares.

     20.  In or about June 2006, Investor-1 received a

phone call from Locke Landis with two men on the line

simultaneously.  The Locke Landis representatives told Investor-1

that they needed his approval to sell 34,500 shares of Grant

Boxing stock at $1.75 a share for a total of $61,162.  They also

said that Investor-1 had to transfer those funds towards the

purchase of Exposure Management shares.  If Investor-1 did not do

this, they explained, he would lose his whole investment in the

Grant Boxing shares.  The Locke Landis representatives wanted

Investor-1 to purchase $100,000 in Exposure Management shares in

total (50,000 shares at $2.00 a share).  Investor-1 was informed

of this deal via a phone call only; there was no paperwork

regarding the necessity to sell the Grant Boxing shares.  In

addition to the sale of the Grant Boxing stock, the Locke Landis

representatives also wanted to take his promissory note principle of $25,000 and apply it towards the Exposure Management shares. Investor-1 agreed to the deal.

21.   Investor-1 never received any share certificates for his Grant Boxing shares, despite asking for the certificates to be sent to him numerous times.  He was told by Locke Landis representatives that they were forthcoming but he never received them.

**IV. Exposure Management, Inc.**

22.   Conspirators LABINER, AWAN, and "K.C." began planning the Exposure Management scheme in approximately the summer of 2004.  Co-conspirator K.C. controls Exposure Management, a company that claims to manage and promote popular musicians, models, and actors.  AWAN and K.C. have known each other for over ten years, and in the summer of 2004 AWAN proposed that K.C. meet with him and LABINER over dinner in Boston to discuss having their firm raise capital for Exposure Management through a private placement.  At that dinner AWAN and LABINER encouraged K.C. to work with them by describing how much success they had enjoyed in a similar, earlier scheme involving Grant Boxing.  AWAN and LABINER proposed that their firm would raise $3,000,000 for Exposure Management, and that their firm would keep 25% of the money raised.  LABINER told K.C. that he, K.C., could never let anyone else know that the firm would receive more

than 7% of the money raised.

23.    Either at the dinner meeting or in the months that followed, AWAN and LABINER made it clear to K.C. that they were going to tell investors they were taking Exposure Management public.

24.    Analysis of records from bank accounts in the name of Locke Landis at Citibank indicates that K.C. received over $150,000 from the ORGANIZATION for his participation in the scheme.

25.    As part of the plan for Exposure Management, LABINER and AWAN proposed that K.C. move himself and his business to New York City, where they would set him up with an office. K.C. moved to New York City in or about October 2005.  In the time between the Boston dinner and K.C.'s move to New York City, K.C. spoke frequently to AWAN regarding the scheme on the phone.

26.    Members of the ORGANIZATION instructed K.C. to have a lawyer prepare an offering memorandum for the private placement.  K.C. chose "G.A." of Adam Leitman & Bailey, and first went to see G.A. at his office in 2005.  LABINER had "S.C.," an associate of LABINER and his family, accompany K.C. on that visit.[4]

---

[4]    Through investigation, I have learned that S.C. suffered a traumatic brain injury in or about June 2006, leaving him paralyzed.  He is said to leave his house only to obtain therapy once a week.

27.  At least three different versions of the offering
memorandum (dated May 22, 2006, November 1, 2007, and September
1, 2008, respectively) have been sent to investors, all of which
contain material misrepresentations about the nature of Exposure
Management and the offering.  All three offering memorandums
misrepresent the current contracts that the company has; for
example, all three memorandums falsely claim that Exposure
Management has contracts with musician Michael Balzary ("Flea"
from the rock group "The Red Hot Chili Peppers").  The 2008
memorandum also falsely claims that Exposure Management has
contracts with the rock musician Seal.  And all three memorandums
also lie about the membership of its "Advisory Board," falsely
claiming that Gloria Estefan and former Dallas Cowboys
quarterback turned-businessman Roger Staubach are both
"directors" of Exposure Management who advise the company and
have equity stakes in the business.

28.  All three offering memorandums also misrepresented
how the proceeds of the offerings would be used.  For although
each memorandum contains a detailed discussion of expenses, none
of the memorandums disclose that Locke Landis would, in fact,
keep nearly 100% of the money raised for Exposure Management.
Moreover, none of the memorandums even disclosed that Exposure
Management had agreed with Locke Landis (at the Boston dinner of
LABINER, AWAN, and K.C.) that Locke Landis would keep at least

25% of the proceeds raised.

29.   Two cold-callers who worked at the ORGANIZATION's boiler room at 6019 4th Avenue, Brooklyn, New York in 2008, have become confidential informants, "CI-1" and "CI-2."  Both have stated that AWAN and TANWIR trained and then supervised groups of cold-callers who made phone calls to prospective investors from inside the boiler room.  AWAN and TANWIR told their trainees to use fake names and sometimes chose particular names for them to use.

30.   CI-2 stated that LABINER spent most of his workday alone in his office at the boiler room smoking pot that is delivered to him at the boiler room.

31.   CI-1 said that he obtained his job as a cold-caller at the ORGANIZATION, which he knew as the Locke Landis entity, through AWAN.  CI-1 identified AHMED AWAN from a photograph shown to him by law enforcement agents.

32.   CI-1 said that on the day he began work, AWAN told him that he would be making $150 per week, plus a bonus if a person that a cold-caller sent a package to subsequently purchased stock.  Later on, AWAN explained to CI-1 that in the event of a sale of stock the ORGANIZATION would get a certain percentage of the purchase price, as would CI-1.

33.   Before CI-1 was allowed to begin making phone calls, he was trained by listening to others make cold calls, and

by receiving instruction from members of the ORGANIZATION.  Among other things, members of the ORGANIZATION told CI-1 to never leave a message if he didn't reach the person he was calling.

34.  AWAN told CI-1 not to use his real name on the phone and to instead use a name that AWAN picked out for him. AWAN never explained to CI-1 why he could not use his own name.

35.  CI-1 noted that cold-callers were constantly using different names at Locke Landis.  CI-1 also said that AWAN would watch and listen to the cold-callers as they made their calls.

36.  To make cold calls, CI-1 used names and telephone numbers written on paper sheets that members of the ORGANIZATION gave him.  Some of the sheets contained addresses as well.  The sheets appeared to have been printed off a computer.

37.  CI-1 observed that some of the other cold-callers used pre-written scripts to pitch investments to the people they called.

38.  With respect to cold calling activity, CI-1 said that he understood that if things were going well, that he was expected to offer to send out a package via Federal Express to the potential customer. On a few occasions when a call was going well, a member of the ORGANIZATION and a supervisor of cold-callers that CI-1 knew as "Igor" took the phone away from CI-1 and offered to send out the package to the person that CI-1 was just speaking with.  CI-1 witnessed Igor offering to send

packages to a number of people on the phone.

39.  CI-1 identified a man named "Corey" as another boss for the ORGANIZATION at the boiler room.  CI-1 said that he was paid twice while he worked at the ORGANIZATION, each time in cash, by Corey.  CI-1 noted that Corey told him at some point that he was licensed to sell stock.  CI-1 identified a photograph of KHURRAM TANWIR as Corey.

40.  CI-2 stated that he obtained his job as a cold-caller at the ORGANIZATION, which he knew as the Locke Landis entity, through AWAN.  CI-2 identified AWAN from a photograph shown to him by law enforcement agents.

41.  CI-2 began working as a cold-caller for the ORGANIZATION, which he knew as the Locke Landis entity, in September 2008.  CI-2 stated that on his first day of work TANWIR handed him a script or "pitch sheet" to use to sell Exposure Management Stock.  CI-2 identified a photograph of KHURRAM TANWIR as TANWIR.  TANWIR told CI-2 to study the sheet and practice with it for the day.

42.  TANWIR also instructed CI-2 to use a fake name when calling, and preferably a name that sounded Jewish.

43.  CI-2 stated that TANWIR trained other newly-hired cold-callers, and that TANWIR instructed all the cold callers to tape a pitch sheet to the desk in front of them that detailed the nature of the investment in Exposure Management.  Individual

cold-callers could tailor the pitch somewhat, but it was basically the same for all the callers. The pitch began with the line "you missed the last opportunity when we called you about 'X,'" with "X" being the name of an actual stock that had just increased in price. In fact, as CI-2 explained, there had been no previous call to the potential investor about stock X, but the assumptions behind the pitch were (1) that the potential investor would not remember that there had never been a call and (2) that the rise in stock X's price would make the cold-caller's pitch for Exposure Management shares more credible and appealing.

44. The pitch sheet used by CI-2 incorporated various lies, including a false name to use on the phone and a lie that Locke Landis did not charge commissions on stock it sold.

45. According to CI-2, TANWIR instructed all cold-callers to end the call with an interested investor by stating that they would put the investor down for a certain number of shares, and that they would send the paperwork to the investor overnight.

46. In addition, CI-2 stated that TANWIR also told the cold-callers that they could accept money from IRAs.

47. CI-2 observed that AWAN and "A.W.," another member of the ORGANIZATION who acts as AWAN's secretary, gave the cold-callers leads, meaning names and telephone numbers of potential investors to call. AWAN told CI-2 that he pays a

friend on Wall Street for a disk containing the leads once or twice per month in exchange for a few thousand dollars.

48. CI-2 stated that AWAN instructed the cold-callers not to make any calls to potential investors in the tri-state area because they live "too close" and could "check things out."

49. CI-2 said that members of the ORGANIZATION told cold-callers to rate the leads from one to five, with five being the most interested and likely to invest money. The higher rated leads were given to A.W., who prepared an Exposure Management package containing the private placement memorandum, a purchase agreement, and a document stating that the customer potentially owns a certain amount of shares. The packages were sent via Federal Express.

50. Sometimes, after the cold-callers had developed an investor's interest in Exposure Management, AWAN was brought in to serve as a "closer" and secure the investment. CI-2 stated that at these times AWAN would go into an office off of the main room and close the door to speak to the potential investor. AWAN would later come out and say "problem solved." CI-2 has heard AWAN state that "there is not a person I can't close."

51. CI-2 said that Investors were instructed to send their checks to E. 14th Street, Suite 173, New York, NY 10003. Either A.W. or "S.M.," a woman who acts as LABINER's secretary, would pick up the mail from the East 14th Street

address.

52.  CI-2 stated that cold-callers were generally
paid a baseline cash sum each week, plus 2.5% of the money that
they brought in.

53.  CI-2 observed S.M. arrive at the boiler room
with envelopes filled with cash.  AWAN then handled the cash,
paying everyone on Fridays at 4:00 p.m.

54.  CI-1 saw K.C. at the boiler room on two
separate occasions.  CI-2 also saw K.C. visit the boiler room a
few times.  CI-2 reported that there are surveillance cameras
mounted at the bottom of the steps to the Boiler room, so that a
person can be seen when he comes to the door.  The cold-callers
were instructed by managers in the ORGANIZATION to hang up the
phone whenever K.C. visited the Boiler room because K.C. had been
told that Locke Landis was not yet selling Exposure Management's
stock.

55.  On AWAN's instructions, K.C. deliberately
deceived an investor ("Investor-4") regarding AWAN's relationship
with Exposure Management.  Specifically, K.C. helped AWAN
entertain Investor-4 and his wife in NYC, and, on AWAN's
instructions, pretended that AWAN worked at Exposure Management.

56.  In or about June 2006, Investor-1, who had
previously invested in Manhattan North and Grant Boxing, invested
in Exposure Management.  Two members of the ORGANIZATION called

Investor-1 at the same time and convinced him to sell $25,000 worth of shares in Grant Boxing, another company sold by the ORGANIZATION, and purchase shares in Exposure Management.  The two men stated that if Investor-1 did not make the transfer, he would lose his entire investment in the Grant Boxing shares.

57.  In or about September 2008, an 85 year-old investor ("Investor-5") received a phone call from a member of the ORGANIZATION who identified himself as "Michael Landis" of the Locke Landis entity.  "Michael Landis" told Investor-4 about an offer to buy pre-IPO stock involving Exposure Management. Over the next few months Investor-5 had more conversations with "Landis" and purchased at least $8,000 worth of Exposure Management stock.  At various points "Landis" told Investor-4 that Exposure Management was going to be taken over, and that, when it was, Investor-5 would make a lot of money.  In the months that followed Investor-5 placed numerous phone calls to Locke Landis and was told that the deal had not been finished yet, but that he would receive his money soon.  Investor-5 was also told that "Michael Landis" no longer worked at Locke Landis.

58.  On or about September 3, 2008, a 76 year-old investor ("Investor-6") received a phone call from a member of the ORGANIZATION who identified himself as "Michael Landis" of the Locke Landis entity. "Michael Landis" stated that Exposure Management was going to engage in a private placement of shares

at $6 per share, but that he would sell the shares to Investor-6 at a lower price of $5.10 per share.  Investor-6 understood "Landis" to mean that Exposure Management would buy the shares from him for $6 per share, making him a profit of $.90 per share. Investor-6 agreed to invest.  Soon after the conversation Investor-6 received an offering memorandum for Exposure Management in the mail and read parts of it.  He was impressed by the famous stars affiliated with the company, including former Dallas Cowboys quarterback Roger Staubauch.  Investor-6 initially invested $3,500.

59.  After Investor-6's initial investment, but still in or about September 2008, "Landis" called Investor-6 again and stated that Exposure Management would soon pay the $6 per share. Investor-6 agreed to buy additional shares at a price of approximately $3.50 per share.  When Investor-6 asked when he would receive the benefits of his investment, "Landis" promised him it would be soon.

60.  In or about the end of September 2008, "Landis" called Investor-6 again, informing him that one of his clients had passed away and that Investor-6 could purchase the client's shares for about $2.50 per share.  Investor-6 told "Landis" that he could come up with a little money if the investment would pay off soon, but that he was not a millionaire and that the return on this investment was needed for his living expenses.  "Landis"

assured him that he would make a fortune and suggested that he come up with $25,000. "Landis" also encouraged Investor-6 to cash in his individual retirement accounts, use all available credit on any credit cards, and borrow money from the bank to obtain the $25,000. Furthermore, "Landis" promised Investor-6 that he would receive his proceeds from Exposure Management before he incurred any interest or penalties on the IRAs or the credit cards. On this understanding, Investor-6 cashed in two IRAs and maxed out one credit card to obtain $25,000 to invest. Investor-6 wired the money on or about September 30, 2008.

61. In the weeks that followed, Investor-6 received another call from "Michael Landis" advising that another client had passed away and that he could buy his shares at $1.88 per share which represented a huge discount. Investor-6 sent him two checks for $5,000 and $6,875. The $5,000 check bounced because Investor-6 did not get enough money into his account fast enough. In total, Investor-6 paid approximately $60,625 for 27,500 Exposure Management shares at prices ranging from $5.10 to $1.88 per share. At some point after Investor-6 had sent the ORGANIZATION his money, he contacted "Landis" and asked that $10,000 to $20,000 be returned to him because he could not afford to pay his bills. "Landis" said that it was impossible because the money had been invested. Instead, Investor-6 received two checks from Locke Landis totaling $1,350 in October that "Landis"

described as "an overpayment."

62.  In or about October and November 2008 Investor-6
had numerous telephone conversations with "Michael Landis" about
his money from Exposure Management.  "Landis" kept promising that
the money was forthcoming but it never arrived.  Investor-6 last
spoke to "Landis" on December 5, 2008.  During that conversation
"Landis" again promised that a check was coming and that
Investor-6 would have "a white Christmas."

**IV. Analysis of the ORGANIZATION's Bank Records**

63.  I have received and reviewed bank account
records that relate to the ORGANIZATION, Manhattan North, Next
Point, Grant Boxing, and Exposure Management.  These accounts
were identified through observations of mail delivered to the
various "mail drops" (most of them UPS Stores) as well as through
analysis of investor checks.

64.  With respect to an account in the name of
"Manhattan North Properties" maintained at TD Bank (the
"Manhattan North Account"), I obtained and analyzed records for
the almost five-year period from July 2004 to May 2009.  The only
signatory on the TD Bank Account is S.C., an associate of LABINER
and his family.[5]  For the period from July 2004 to May 2009, the

---

[5]     As noted above, S.C. was paralyzed and housebound in or
        about June 2006.  See n.4, supra. Nevertheless, there have
        been numerous deposits and withdrawals from the Manhattan
        North Account since June 2006.

deposits received in the TD Bank Account totaled $3,452,164.44 and disbursements were almost equal, totaling $3,451,765.42. There are no discernable investments into real property, the stated business purpose of Manhattan North in brochures received by investors.

65. Many deposit items in the Manhattan North Account at TD Bank can be identified as coming from investors in Manhattan North. For example, monies have been traced to investors who have been interviewed by agents and identified as victims of this scheme, including the investors previously described in this affidavit as Investor-1 and Investor-2. The deposit items from other individuals are easily identified as investments in the Manhattan North entity because of notes made on the checks, the amount of the checks, and the addresses on the checks, which show that the individuals who sent the checks are located all over the country. Of the $3,452,146 deposited into the Manhattan North account, $3,168,003 (i.e., the vast majority), appears to come directly from investors in the entity.

66. Some disbursements from the Manhattan North Account were payments made to individual investors; based on my analysis and interviews of investors, I believe that most of these were purported interest payments on the promissory notes. But substantial sums went to other sources as well. ATM withdrawals totaled $95,367, and cash withdrawals in all other

forms totaled $606,149; $638,112 was transferred to Next Point;
over $300,000 was transferred to Locke Landis; $34,000 was
transferred to a firm named Goldline International, Inc.; and
$465,184 was transferred to Monex Deposit Corp. of Newport Beach,
California, which sells precious metals to retail customers.[6]  In
addition, $1,751 was spent at the restaurant "Phillipe," $2,495
was spent at Telecharge Tickets, $709 was spent at Ticketmaster,
and $28,113 was spent at a restaurant in Bay Ridge called "The
Pearl Room."

    67.  The Locke Landis entity maintained three linked
bank accounts at Citibank (the "Locke Landis Accounts").  The
sole signatory was S.C., the same person who served as the
signatory for the Manhattan North Account.  The Locke Landis
Accounts were closed in or about March 2009.  I have obtained and
analyzed records of the Locke Landis Accounts for the four-and-a-
half year period from August 2004 through March 2009.

    68.  A total of $3,655,738 was deposited into the
Locke Landis Accounts at Citibank during the relevant period.
The majority of that money came directly from investors in the
various entities touted by the ORGANIZATION, although the

---

[6]    From August 2, 2006 to March 21, 2007, Manhattan North sent
a net sum of $464,184 to Monex.  (Manhattan North tried to
send more money, but one of its checks bounced.)   Manhattan
North bought two kinds of gold coins: Philharmonics, which
are minted in Austria, and Krugerrands, which are minted in
South Africa.

accounts also received $308,500 in deposits from Manhattan North

and $71,500 from Next Point.  Among the investors who sent monies

are persons who have been interviewed by law enforcement agents

and identified as victims of the scheme, including Investor-1,

Investor-2, Investor-5, and Investor-6.  Many of the checks

deposited in the account, including checks from seven of the

identified investors, were sent to purchase shares in Exposure

Management.  The monies from Investor-1, however, were for the

purchase of Grant Boxing stock and promissory notes.  In

addition, in the early years of the account activity, meaning

2004 through early 2006, notes written on checks deposited in the

Locke Landis Accounts indicate that money was sent to purchase

Grant Boxing stock, Grant Boxing promissory notes, and Exposure

Management promissory notes (as opposed to Exposure Management

stock).

69.  As with the Manhattan North Account at TD Bank,

some of the monies deposited in the Locke Landis Accounts at

Citibank were disbursed to individual investors, but substantial

sums also went to other sources.  ATM withdrawals totaled

$750,760, and cash withdrawals in all other forms totaled

$1,017,150; $132,637 was sent to Exposure Management; $23,200

went to K.C.; $18,000 was paid to the law firm of Adam Leitman

and Bailey, PC, where G.A., the lawyer who drafted the Exposure

Management offering memorandum, practices; $12,500 was sent to

Grant Boxing; $132,941 was sent to Manhattan North Properties; and $296,250 was sent to Next Point.  Monies were also spent on an assortment of personal and entertainment expenses: $6,115 at the restaurant Phillipe, $2,714 at Stubhub, Inc., $1,040 at Telecharge Ticketing, $8,051 at the restaurant "Mr. Chow's," $8,354 at The Pearl Room restaurant, $10,668 at the Millennium UN Plaza Hotel, $2,976 at the cosmetics purveyor Kiehl's, $3,218 at Sam Ash music, $1,143 at the Red Door spa, and $2,600 at NYC Banqueting and Catering, an alternate, "doing business as" name for the strip club "Scores."

70.  A teller at the Citibank branch at 75th Street and 3rd Avenue in Brooklyn, N.Y., has identified a photograph of ALAN LABINER as a man who has made cash withdrawals from the three Locke Landis Accounts on at least ten separate occasions in 2008 and 2009.  The teller recalls that LABINER generally presented a debit card in the name of S.C.,[7] along with the account's pin number, and that LABINER generally withdrew $1,000 from each account, for $3,000 total.  The teller said that if LABINER had withdrawn more than $1,000 from each account, bank policy would have required LABINER to produce identification beyond the pin number and debit card in the name of S.C.

---

[7]   By this point S.C. was paralyzed and housebound.  See n.4, supra.

71.   I have also obtained and analyzed bank records for an account at JP Morgan Chase in the name of Next Point (the "Next Point Account").  My analysis of the Next Point Account covered the period from late September 2005 to late February 2009.  The only signatory on the Next Point Account was "C.P.," the signatory on the mail drop location for Next Point. Also, law enforcement agents have observed C.P. entering and exiting the SUBJECT PREMISES on three different days.  The deposits received in the TD Bank Account totaled $1,521,071 and the disbursements totaled $1,395,831 — the vast majority of the amount deposited.

72.   Much of the approximately $1.5 million in deposits in the Next Point Account at Chase came directly from checks written by individual investors, although $295,650 came from Locke Landis and $609,281 came from Manhattan North.  As with the other accounts mentioned above, the investors who sent monies include persons who have been interviewed by law enforcement agents and identified as victims of the scheme, including Investor-2.

73.   ATM withdrawals from the Next Point Account totaled $2,006, and cash withdrawals in all forms totaled $1,017,150; $71,500 went to Locke Landis Harriman, $38,800 went to Manhattan North, $27,310 went to Exposure Management, $5,058 went to pay a Capital One credit card, and $6,500 went to pay a

Bank of America credit card.   And once again, monies were spent on entertainment expenses, including $3,731 at The Pearl Room.

74.   The ORGANIZATION also kept an account in the name of the Landis Harriman & White entity at TD Bank (the "Landis Harriman Account").   I obtained and analyzed records from the Landis Harriman account covering the period from February 2009 to April 2009.   The only signatory on the account is C.P. Deposits into the account total $11,000.   Most of the funds appear to come from investors, with $1,000 from Manhattan North. On February 27, 2009, a cash withdrawal of $1,025 was made, apparently by C.P.

75.   In sum, my review and analysis of accounts containing information relating to the ORGANIZATION, Manhattan North, Next Point, Grant Boxing, and Exposure Management indicates that over approximately five years the ORGANIZATION amassed more than $6,970,405 in funds ($6,186,654 of which is from specifically identified investors); that the ORGANIZATION spent most of the money; that the members of the ORGANIZATION withdrew $848,133 via ATM and $2,501,699 in other forms of cash, or approximately 48% of the total, for their personal use; that the ORGANIZATION appropriated almost $500,000 raised from Manhattan North investors and bought gold, not Manhattan real estate; and that beyond the funds withdrawn in cash or invested in gold, members of the ORGANIZATION used credit cards or debit

cards to pay for various personal expenses, including $40,198 in meals at The Pearl Room.  For convenience, I have also summarized my analysis in the following table (all figures are approximate):

| Company Name | Total deposits | Money from identified investors | Money sent to other companies in scheme | Money spent for personal benefit or to promote scheme | Money returned to investors as "dividends" |
|---|---|---|---|---|---|
| Manhattan North | $3,452,146 | $3,168,003 | $946,612 | $1,235,569 | $793,378 |
| Locke Landis | $3,655,738 | $2,475,746 | $574,328 | $1,677,010 | $138,359 |
| Next Point | $1,521,071 | $542,905 | $137,610 | $1,029,387 | $97,790 |
| Landis Harriman | $11,000 | $10,000 | | $1,025 | |
| Totals | $8,639,955 | $6,196,654 | $1,658,550 | $3,942,991 | $1,029,527 |

None of the money was actually invested in the activities that were the ostensible purpose of the companies, such as real estate in upper Manhattan, high rate credit cards, private placements in stocks, or promissory notes.

76.   More recently, I have also received and reviewed bank records for four additional accounts that are being actively used by the organization.[8]

77.   Specifically, I have reviewed records for three linked accounts held at Bank of America in the name of Landis Harriman & White, Inc., accounts number 483023519661, 483023519687, and 483023519674 (the "Bank of America Accounts"). These accounts were opened on May 28, 2009 by C.P., the same signatory on both the mail drop location for Next Point and for the Next Point Account described above. C.P. also submitted a signed Corporate Resolution as the President of the corporate entity to Bank of America while opening the Bank of America Accounts. C.P. is listed as the President on the corporate signature card and is the sole signatory.

78.   Similar to the accounts described above in this affidavit, there are numerous deposits from disparate investors into the Bank of America Accounts, yet there is no apparent investment of these funds in any form. Instead, there are numerous withdrawals of large amounts of U.S. currency as well as frequent ATM usage, both of which are inconsistent with investing. Specifically, there was approximately $112,000 deposited from investors and approximately $91,000 that exited

---

[8]   Records for these accounts were received very recently and so were not included in the above summary table (in paragraph 75).

the account in this fashion during the time period reviewed, May 28, 2009 through July 30, 2009. As such, there is no apparent legitimate use of the Bank of America Accounts. Rather, these accounts appear to be used in the same manner as the accounts described above and in furtherance of the scheme discussed throughout this affidavit.

79. I have also reviewed records for account number 7047277439 held at Capital One Bank in the name of Manhattan North Properties #43, Inc. (the "Capital One Account"). The Capital One Account was opened on or about June 5, 2009, by "C.P.," the same signatory on the mail drop location for Next Point as well as the Next Point Account and the Bank of America Accounts described above.

80. Examination of the bank records for the Capital One Account demonstrates that the activity in this account is virtually identical to the other bank accounts used by the ORGANIZATION discussed above. There are numerous deposits from disparate investors into the Capital One Account, but no apparent investment activity. Additionally, there are check payments deposited into this account from the Bank of America Accounts as well as a large number of debit card transactions billed to Federal Express, which was used in the scheme discussed throughout this affidavit to transmit and receive documents and payments.

## PROBABLE CAUSE TO ARREST THE DEFENDANTS

81.   Based upon the information set forth below, my
training, experience, and participation in this and other
financial crime and money-laundering investigations, and my
conversations with other law enforcement officers, there is
probable cause to arrest ALAN LABINER, KHURRAM TANWIR, and AHMED
AWAN for conspiracy to commit securities fraud, mail fraud, and
wire fraud.

**I. Alan Labiner**

82.   In the summer of 2004, LABINER, AWAN, and K.C. met
over dinner in Boston to discuss having their firm raise capital
for Exposure Management through a private placement.  At that
dinner AWAN and LABINER encouraged K.C. to work with them by
describing how much success they had enjoyed in a similar,
earlier scheme involving Grant Boxing.  AWAN and LABINER proposed
that the firm would raise $3,000,000 for Exposure Management, and
that their firm would keep 25% of the money raised.  LABINER told
K.C. that he, K.C., could never let anyone else know that their
firm would receive more than 7% of the money raised.

83.   Either at the dinner meeting or in the months that
followed, AWAN and LABINER made it clear to K.C. that they were
going to tell investors that they were taking Exposure Management
public.

84. As part of the plan for Exposure Management, LABINER and AWAN proposed that K.C. move himself and his business to New York City, where they would set him up with an office. K.C. moved to New York City in or about October 2005.

85. Members of the ORGANIZATION instructed K.C. to have a lawyer prepare an offering memorandum for the private placement. K.C. chose G.A. of Adam Leitman & Bailey, and first went to see G.A. at his office in 2005. LABINER had S.C., an associate of LABINER and his family, accompany K.C. on that visit.

86. Using the alias "Robert Brewster," LABINER has personally obtained money through the use of materially false statements in connection with the Next Point scheme.

87. In 2007, Investor-2 received a cold call from an individual who identified himself as "Robert Brewster" of Next Point and offered to sell Investor-2 promissory notes in Next Point. "Brewster" stated that Next Point invested in high interest credit cards which charged as much as 30%. Investor-2 expressed interest and received printed materials by mail. The printed materials included a promissory note that listed Next Point of "388 2nd Avenue, Suite 445, New York, NY 10010" as the "issuer" and Locke Landis of "111 East 14th Street, Suite 173, New York, NY 10003" as the "guarantor." Investor-2 soon invested

$5,000 in a promissory note with "Brewster" by mailing a check in the name of Next Point to 388 2nd Avenue, N.Y., N.Y.  Later, near the end of 2007, Investor-2 purchased an additional promissory note in Next Point for $10,000.  The second promissory note also listed Next Point as the "issuer" and Locke Landis as the "guarantor" and gave the same two addresses that were on the first note.  Investigation has revealed that 388 2nd Avenue and 111 East 14th Street are actually mail drops, and specifically UPS stores.

88.   Investor-2 made a trip to New York City in connection with his Next Point investment in early 2008.  Next Point paid for round-trip airline tickets, a hotel, and a Broadway show for Investor-2 and his wife, and a dinner for at least five individuals: "Brewster," a female associate of "Brewster" named "Alexis," another female introduced to Investor-2 as an intern, and Investor-2 and his wife.  Investor-2 was not taken to the Next Point office as he was told that they were not open during the weekend.  At that dinner "Brewster" assured Investor-2 that Next Point was a real company and urged him to continue his investment.

89.   Investor-2 has since identified a photograph of ALAN LABINER as "Brewster."

90.   CI-2 said that Investors were instructed to send their checks to E. 14th Street, Suite 173, New York, NY 10003.

Either A.W. or S.M., who acts as LABINER's secretary, would pick up the mail from the East 14th Street address.

91.   With respect to the Manhattan North Account described above (an account in the name of "Manhattan North Properties" maintained at TD Bank), I obtained and analyzed records for the almost five-year period from July 2004 to May 2009.  The only signatory on the TD Bank Account is S.C., an associate of LABINER and his family.

92.   A teller at the Citibank branch at 75th Street and 3rd Avenue in Brooklyn, N.Y., has identified a photograph of ALAN LABINER as a man who has made cash withdrawals from the three Locke Landis Accounts on at least ten separate occasions in 2008 and 2009.  The teller recalls that LABINER generally presented a debit card in the name of S.C.,[9] along with the account's pin number, and that LABINER generally withdrew $1,000 from each account, for $3,000 total.  The teller said that if LABINER had withdrawn more than $1,000 from each account, bank policy would have required LABINER to produce identification beyond the pin number and debit card in the name of S.C.

93.   CI-2 stated that LABINER spent most of his workday alone in his office at the boiler room at 6019 4th Avenue, Brooklyn, smoking pot that is delivered to him at the location.

---

[9]   By this point S.C. was paralyzed and housebound.  See n.4, supra.

94.   Law enforcement agents have observed LABINER entering and leaving the boiler room, and have also observed him in the vicinity of the boiler room multiple times.   LABINER has been identified from his driver's licenses and other photographs.

95.   Law enforcement agents have repeatedly observed a car associated with LABINER — the car was leased by a corporation that LABINER controls[10] and agents have seen LABINER driving the car — parked outside the location.   Agents have observed the car bearing license plates that read "BOVDALAW," then license plates that read "MYCAR711," and then, on and after August 27, 2009, agents have seen the car once again bearing the "BOVDALAW" plates.

96.   On two occasions, law enforcement agents have observed a car rented by LABINER parked outside the boiler room.

97.   In the last two weeks, law enforcement agents have observed Awan's car and Labiner's car at the SUBJECT PREMISES on multiple occasions, and have observed Labiner standing in front of the subject premises on one occasion.

## II. Khurram Tanwir

98.   CI-1 and CI-2 stated that TANWIR trained and then supervised groups of cold-callers who made phone calls to prospective investors from inside the boiler room.   TANWIR told

---

[10]   The signatory of the lease application itself is Alan Labiner, Jr., LABINER's son.

his trainees to use fake names and sometimes chose particular names for them to use.

99.   CI-1 identified a man named "Corey" as another boss for the ORGANIZATION at the boiler room.   CI-1 said that he was paid twice while he worked at the ORGANIZATION, each time in cash, by Corey.   CI-1 noted that Corey told him at some point that he was licensed to sell stock.   CI-1 identified a photograph of KHURRAM TANWIR as Corey.

100.   CI-2 began working as a cold-caller for the ORGANIZATION, which he knew as the Locke Landis entity, in September 2008.   CI-2 stated that on his first day of work TANWIR handed him a script or "pitch sheet" to use to sell Exposure Management Stock.   CI-2 identified a photograph of KHURRAM TANWIR as TANWIR.   TANWIR told CI-2 to study the sheet and practice with it for the day.

101.   TANWIR also instructed CI-2 to use a fake name when calling, and preferably a name that sounded Jewish.

102.   CI-2 stated that TANWIR trained other newly-hired cold-callers, and that TANWIR instructed all the cold callers to tape a pitch sheet to the desk in front of them that detailed the nature of the investment in Exposure Management. Individual cold-callers could tailor the pitch somewhat, but it was basically the same for all the callers.   The pitch began with the line "you missed the last opportunity when we called you

about 'X,'" with "X" being the name of an actual stock that had

just increased in price.  In fact, as CI-2 explained, there had

been no previous call to the potential investor about stock X,

but the assumptions behind the pitch were (1) that the potential

investor would not remember that there had never been a call and

(2) that the rise in stock X's price would make the cold-caller's

pitch for Exposure Management shares more credible and appealing.

103.  According to CI-2, TANWIR instructed all cold-

callers to end the call with an interested investor by stating

that they would put the investor down for a certain number of

shares, and that they would send the paperwork to the investor

overnight.

104.  In addition, CI-2 stated that TANWIR also told

the cold-callers that they could accept money from IRAs.

105.  Law enforcement agents have repeatedly observed a

car rented by TANWIR parked outside of the boiler room.  On two

occasions law enforcement agents have observed TANWIR park the

car and then enter the boiler room.

III.  Ahmed Awan

106. In the summer of 2004, LABINER, AWAN, and K.C. met

over dinner in Boston to discuss having their firm raise capital

for Exposure Management through a private placement.  At that

dinner AWAN and LABINER encouraged K.C. to work with them by

describing how much success they had enjoyed in a similar,

earlier scheme involving Grant Boxing.  AWAN and LABINER proposed
that their firm would raise $3,000,000 for Exposure Management,
and that their firm would keep 25% of the money raised.  LABINER
told K.C. that he, K.C., could never let anyone else know that
their firm would receive more than 7% of the money raised.

107. Either at the dinner meeting or in the months that
followed, AWAN and LABINER made it clear to K.C. that they were
going to tell investors that they were taking Exposure Management
public.

108. As part of the plan for Exposure Management,
LABINER and AWAN proposed that K.C. move himself and his business
to New York City, where they would set him up with an office.
K.C. moved to New York City in or about October 2005.  In the
time between the Boston dinner with AWAN and LABINER and K.C.'s
move to NYC, K.C. spoke frequently to AWAN regarding the scheme
on the phone.

109. CI-1 and CI-2 stated that AWAN trained and then
supervised groups of cold-callers who made phone calls to
prospective investors from inside the boiler room.  AWAN told his
trainees to use fake names and sometimes chose particular names
for them to use.

110. CI-1 said that he obtained his job as a cold-
caller at the ORGANIZATION, which he knew as the Locke Landis
entity, through AWAN.  CI-1 identified AHMED AWAN from a

photograph shown to him by law enforcement agents.

111. CI-1 said that on the day he began work, AWAN told him that he would be making $150 per week, plus a bonus if a person that a cold-caller sent a package to subsequently purchased stock. Later on, AWAN explained to CI-1 that in the event of a sale of stock the ORGANIZATION would get a certain percentage and CI-1 would also get a certain percentage.

112. AWAN told CI-1 not to use his real name on the phone and to instead use a name that AWAN picked out for him. AWAN never explained to CI-1 why he could not use his own name.

113. CI-1 noted that cold-callers were constantly using different names at Locke Landis. CI-1 also said that AWAN would watch and listen to the cold-callers as they made their calls.

114. CI-2 stated that he obtained his job as a cold-caller at the ORGANIZATION, which he knew as the Locke Landis entity, through AWAN. CI-2 identified AWAN from a known picture shown to him by law enforcement agents.

115. CI-2 observed that AWAN and A.W., another member of the ORGANIZATION who acts as AWAN's secretary, gave the cold-callers leads, meaning names and telephone numbers of potential investors to call.

116. CI-2 has stated that AWAN said he pays a friend on Wall Street a few thousand dollars once or twice per month for a disk containing the cold-call leads.

117. CI-2 stated that AWAN instructed the cold-callers not to make any calls to potential investors in the tri-state area because they live "too close" and could "check things out."

118. CI-2 said that members of the ORGANIZATION told cold-callers to rate the leads from one to five, with five being the most interested and likely to invest money.  The higher rated leads were given to A.W., AWAN's secretary, who prepared an Exposure Management package containing the private placement memorandum, a purchase agreement, and a document stating that the customer potentially owns a certain amount of shares.  The packages were sent via Federal Express.

119. Sometimes, after the cold-callers had developed an investor's interest in Exposure Management, AWAN was brought in to serve as a "closer" and secure the investment.  CI-2 stated that at these times AWAN would go into an office off of the main room and close the door to speak to the potential investor.  AWAN would later come out and say "problem solved."  CI-2 has heard AWAN state that "there is not a person I can't close."

120. CI-2 said that Investors were instructed to send their checks to E. 14th Street, Suite 173, New York, NY 10003. Either A.W., AWAN's secretary or S.M., LABINER's secretary, would pick up the mail from the East 14th Street address.

121. CI-2 stated that cold-callers were generally paid a baseline cash sum each week, plus 2.5% of the money that they

brought in.

122. CI-2 observed S.M. arrive at the boiler room with
envelopes filled with cash.  AWAN then handled the cash, paying
everyone on Fridays at 4:00 p.m.

123. On AWAN's instructions, K.C. deliberately deceived
an investor ("Investor-5") regarding AWAN's relationship with
Exposure Management.  Specifically, K.C. helped AWAN entertain
Investor-5 and his wife in NYC, and, on AWAN's instructions,
pretended that AWAN worked at Exposure Management.

124. CI-1 has indicated that AWAN had a computer at
the boiler room.

125. The New York City Department of Finance's ACRIS
database indicates that Abdul Awan and Bakhat Awan, the parents
of AHMED AWAN, own the boiler room.

126. Federal Express records for deliveries to the
boiler room indicate that AHMED AWAN signed for investors'
packages delivered to the location.  In addition, Federal Express
records for deliveries to the boiler room also contain names of
other persons that CI-1 has identified as members of the
ORGANIZATION.

127. Law enforcement agents have repeatedly observed a
blue Mitsubishi convertible registered to AWAN parked outside of
the boiler room.  In addition, on two occasions law enforcement
agents have observed AWAN parking the car and entering the boiler

room.

128.   In the last two weeks, law enforcement agents have observed Awan's car and Labiner's car at the SUBJECT PREMISES on multiple occasions, and have observed Labiner standing in front of the subject premises on one occasion.

## CONCLUSION

129. Based on all of the foregoing information, my training and experience in law enforcement, my involvement in fraud investigations, including bank fraud, credit fraud, and securities fraud investigations, my participation in the execution of numerous search warrants in connection with those investigations, and my conversations with other law enforcement officers experienced in investigations of similar crimes, I conclude that there is probable cause to believe that there is presently located within the boiler room evidence and instrumentalities, as set forth in Exhibit A to the Search Warrant attached hereto, of violations of federal law, including violations of Title 15, United States Code, Section 78(j)(b) and 78(ff) (securities fraud), Title 17, Code of Federal Regulations,

Section 240.10b-5; and Title 18, United States Code, Section 1341 (mail fraud), Section 1343 (wire fraud) and Section 371 (conspiracy).

WHEREFORE, I respectfully request that the defendants ALAN LABINER, KHURRAM TANWIR, and AHMED AWAN be dealt with according to law.   Furthermore, I respectfully request that this affidavit be filed under seal.


DANE B. WESLEY
Postal Inspector
United States Postal Inspection Service


Sworn to before me this
_8th_ day of September, 2009.


UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK